Good afternoon. This is a matter of Christopher Macaraeg, Ninth Circuit docket number 14, 14-80112 and this is a hearing in response to Mr. Macaraeg's request for a hearing to address the order to show cause why Mr. Macaraeg should not be suspended, sanctioned or disbarred for violating the court's rules and orders. Mr. Macaraeg, why don't you come up and approach the podium here and let me mention to you that this proceeding is being recorded, so it would be helpful if you spoke into the microphone so we can get a clear recording. And I also wanted to make sure you are aware that you are entitled to be represented by counsel at this hearing. Do you understand that? I understand, Your Honor. All right. And you are choosing to represent yourself, correct? That's correct. And the other matter is that I would, I'm going to ask you some questions and I want to make sure that those answers to those questions are under oath. So I'm going to begin by having my courtroom deputy administer the oath to you. Thank you. All right. So you have received the order to show cause and you've responded to it and I have read your response. And I also have the benefit of the opening brief you filed in the matter of Peraza v. Holder, which was one of the matters that was Your Honor, I'll just, if I may, just explain, first of all, a brief background into my practice of immigration law in San Diego, and also afterwards explain the handling of the 11 cases that are alleged by the court. Okay. Let's begin with your background. Let's start with your education. Okay. Well, I graduated from undergrad at UC Santa Barbara in 1996. I worked as a paralegal, then I went to law school in Sacramento, McGeorge School of Law. Graduated, I believe, in 2002 and I took the bar exam in July 2002 and was admitted to California in December of 2002. Soon thereafter, I moved back to San Diego, where it was my hometown, and trained to practice some areas of immigration law for a few months. Afterwards, a business partner of mine agreed to open up our own office in 2003. Excuse me, when you say business partner, you mean another lawyer who you're having a practice with? Yes. What's that lawyer's name? Her name is Rebecca Pedroza. She's no longer my business partner. Since then, I've been practicing immigration law. Primarily, our area of expertise is in family visas, obtaining legal residency, citizenship, and also a good chunk of our cases have to, involves representing individuals in immigration court. Mostly in San Diego, but I do represent some clients in and around California, and some of them are out of state. So I've been doing that since 2003. As the court notes, I applied for admission to the Ninth Circuit on August 19, 2005, after I was contacted by a potential client. He needed help in filing an appeal with the Ninth Circuit. That's my brief background. How long were you with Rebecca Pedroza? From 2003 to sometime in 2006. Unfortunately, her mom got cancer. Her parents live up here in San Jose, so she moved up to be with her. You've been a solo practitioner since 2006? Yes, Your Honor. Briefly, my office at the time, it was just me and my secretary, who pretty much operated as a, she ran the office, and she kept track of all the files and all that. Unfortunately for her, she also became ill. She has lupus, and early this year, she had to leave my office, so I've been shuffling around different secretaries until I finally have found an assistant just recently. Okay. I guess that brings us up to date on your education and your practice. So let's talk about these cases then. Let's start with Pedroza, since that seems to be the one that has led you here. Okay. Berta Pedroza was a longtime client of mine. I don't remember the date she actually hired me, but it was around 2009, 2010. She was detained by Immigration and Customs Enforcement, and I agreed to help her out with first getting her out of custody and then representing her in immigration court. So the immigration proceedings lasted roughly around two years, maybe, two and a half years. There was some discussion about possibly applying for temporary protected status, but unfortunately for Ms. Pedroza, she didn't qualify. So we went forward with her immigration hearing. The judge denied her applications for relief, and we filed an appeal with the Board of Immigration Appeals. The judge's decision was affirmed, and then we filed a petition for review, which brings up to the filing of a petition review with this court. What was the BIA's decision? Essentially, it just affirmed the immigration judge's decision. What was the immigration judge's decision? that she did not qualify for the relief. There were some – well, Ms. Pedroza did testify, but there was some – I don't remember the details of the immigration judge's decision at this time, but the judge's decision was affirmed. Yeah, I can't answer that in detail. I just know that the judge just denied her application for withholding of removal temporary protected – not temporary – protections against a convention against torture. Okay. So then the BIA affirmed, and then on October 15, 2012, you filed a petition for review in our court. Yes. I filed that petition to – let me just take a step back and just explain my dealings with these clients, and it also might help with explaining how I helped Ms. Pedroza. After the BIA affirms the immigration judge's decision, the clients – well, they are very concerned about their chances of staying in the United States, so I agreed to help them out with preserving their appellate rights. So we filed the petitions for review – well, I do – to file the petitions for review to preserve their appellate rights. With Ms. Pedroza's case, my research with her case, I found a case that – where some individuals were not granted the opportunity to apply for prosecutorial discretion with the government. So I decided to take the petition for review that way and argue it with the court to see if Ms. Pedroza can have her chance to apply for prosecution of discretion, which we never had a chance to do when we had our immigration proceedings. When you said you never had a chance to do, did anybody prevent you from asking the government for the exercise of prosecutorial discretion? No, Your Honor, and if I may be clear with that, prosecutorial discretion, as far as I know, has always been an available mechanism to, you know, essentially negotiate with the government, and depending on the individual's background, if they have crimes, their family ties in the United States, my – you know, that's always been around. However, in 2012, I believe, President Obama issued a mandate to the government, essentially to the lawyers representing the Immigration and Customs Enforcement, to see if there's a way to lessen the backlog of cases in the immigration court. Ms. Pedroza's case was – if I remember the timeline correctly, President Obama had not yet issued that mandate, so I did not request prosecutorial discretion with the immigration court at the time. However, through some discussions with some colleagues, they brought up this case, and I don't remember the case offhand right now, Your Honor, but – I know which case you're talking about, but just so that you have the chronology correct, the Morton Memorandum, which is what you're talking about, was issued in June of 2011, and that was a year and four months before you filed the petition for review in the Ninth Circuit. Okay, that – so – Yes, Your Honor, and I didn't ask – that's correct, and I didn't ask for prosecutorial discretion with the government. And when you say that the court issued a decision, do you recall what the decision was, what the context was? Which court are you referring to? The Ninth Circuit. You're saying you found a case that said something about the court made a decision. The Ninth Circuit did not essentially make a decision, but they sent the – they sent a request for guidance from the Department of Homeland Security as to how the Ninth Circuit shall proceed with – At which at that time was a new Morton Memorandum? Yes, Your Honor, and that's what we – at least that's what I tried to do with Ms. Peraza. So the court said, we're going to let you apply to the government for the exercise of prosecutorial discretion. Isn't that what that case stands for? That's correct, yes. So did you apply to the government at any time on Ms. Peraza's behalf? I did not. For the exercise of prosecutorial discretion? I did not. And why did you not do so? I was just essentially just focused on finding – I did not think it was a way for her to – My understanding at the time was that, you know, after the immigration judge had issued his decision, and I did not ask for prosecutorial discretion at the time with the Immigration Customs Enforcement, I thought my chances of asking for prosecutorial discretion had been – I didn't have any more opportunity to negotiate with the government. Why would you think that? Isn't the whole purpose of the Morton Memorandum to give guidance to the immigration officials nationwide as to which folks should be the target of removal and which other folks should not be? Isn't that what that stands for? That's exactly what it stands for, Your Honor. So if that's the case, I don't understand how you could have thought that there was some preclusion from seeking prosecutorial discretion, especially when you already had seen that the Ninth Circuit, in another case, had allowed somebody at a similar stage in the proceedings to request prosecutorial discretion. The Ninth Circuit did not order the exercise of prosecutorial discretion, did it? No. It simply said, we're going to give you an opportunity to ask, correct? Correct. But even though you knew that, you never, even to this day, have asked the government for the exercise of prosecutorial discretion in a case where you've now submitted a brief that sets out the – your – I think what you would say is your case about why this person deserves the exercise of prosecutorial discretion. Have I read this correctly? Yes, Your Honor. And just so the Court knows, Ms. Peraza has retained new counsel. I don't know if he has asked. Okay. Well, I don't know why he wouldn't. Nothing to lose by asking for the exercise of prosecutorial discretion. I don't know what you can say, possibly, at this hearing that would excuse or explain the many, many times you failed to comply with court orders or misunderstood clear language in court orders and otherwise burdened the court to deal with repetitive, futile, pointless motions. In this case, when you could have taken steps that any reasonable lawyer would take early in this case to represent a client, do you have any explanation how I could possibly find that the history, the procedural history in this case, is that of a lawyer fit to practice in the Ninth Circuit? Your Honor, I'll be the first to tell you I need to take a step back and reconsider if I should be helping people in the Ninth Circuit. Again, my expertise is helping individuals with their visas coming into the United States and helping them stay in the United States with the Immigration Court and the Board of Immigration Appeals. Let me just go back with a little anecdote. I have a colleague in San Diego. All he does is appellate practice and specifically with immigration. And for the longest time, I would ask myself, how does he just do that? He, you know, I would think he would, you know, I would always ask myself, why doesn't he also venture out and do other things? Well, now I know. I mean, there's a lot to uphold as a member of this bar and a lot that this court asked the lawyers to understand. So I'll be the first to tell you I need to take a step back and I need to really, if I'm going to help people in the Ninth Circuit, I need to really educate myself on practices, the rules and regulations. I don't intend to help anyone at this moment or in the near future. But and that's all I could say, Your Honor. These people came to me. They were very scared of what might happen to them in the future. And I tried to do what I could to preserve their appellate rights. But I understand now and after getting the, you know, my experience with Ms. Peraza's case that I really need to take a look back and really consider if I want to help people in the Ninth Circuit. All right. So I agree with you. I think it's clear to me from my experience that some people are more cut out by their nature to be trial attorneys or first-level attorneys. And some other people are, by their nature, more inclined to be appellate attorneys. There's not a whole lot of people who fit into both categories. But this level of representation doesn't work at the Court of Appeals. I mean, I could go over. You're, I'm sure, painfully aware of every problem you had every time you didn't do something that was pointed out in the order to show cause in Peraza that caused this court to expend scarce judicial resources to handle these matters. And I tell you, it's extremely frustrating when we issue an order and then you come back with another motion to reconsider, which is not really what you were doing. You were filing motions to reinstate. And we've already told you what you need to do is file the brief and you come in and say you've paid the sanction. And then I get this brief in the Peraza case that you wrote this brief, correct? Yes. In the Peraza case. So the whole thrust of this brief as I read it is you were denied an opportunity to seek prosecutorial discretion or the court should somehow direct, give you an opportunity to seek prosecutorial discretion and that this implicates constitutional issues. I mean, do you, could you make that argument to me here today? That that's, that there's merit to that? Your Honor, I really just wanted to make sure that she had her opportunity to. The answer is no. And the answer is if you want the exercise of prosecutorial discretion, you ask the government if they would be willing to exercise prosecutorial discretion and you write the best brief or argument in favor of the equities of your client and say this is why this client fits within the criteria set out in the Morton Memo and why you shouldn't, you shouldn't remove her because she's one of the people that should be allowed to remain in the country. And then you wait. It's up to the prosecution whether or not they're going to exercise it. That's it. That's a remedy for it. There's no constitutional issue. There's nothing that prevents you, has ever prevented you from asking for that. That's correct. All right. Let me ask you some questions. Well, first question I have for you on this, you were ordered to pay sanctions of $2,000 and you said on many occasions that you moved to reconsider, saying you were in the process of paying or made agreement. What's the status of your payment of those $2,000 in sanctions? It has not yet been paid. It was referred to the U.S. Attorney's Office in San Diego, and they sent me, I told them I couldn't pay all $2,000 up front, and I requested to make the payments in installments, but they wanted to see my income and expenses, so I haven't submitted that to them yet. Okay. And do you intend to do so? I do intend to do so. You know, when the court issues a judgment like this for sanctions, most people pay the sanctions. We don't have to refer it for collection to the U.S. Attorney. That also is a burden on the court that we have to go through that step, and it also burdens the U.S. Attorney's Office has many better things to do than to run after you for $2,000. And it's burdening us because now we're having to follow up on them trying to collect $2,000 that they don't want to do because they don't have the resources to do it either. So this is simply multiplying and making worse an already bad situation. So I urge you to resolve that before that gets more serious. I will, Your Honor. Okay. Now, you were also ordered to produce all fee agreements. You produced one. What steps did you take to locate the other fee agreements? I looked in all the files, Your Honor. I could not find the fee agreements. I could not find some of the files. We do have a storage facility where we keep older cases, and we could not locate specifically the Colasos matter. And essentially we could not find any of the fee agreements in any of the files, Your Honor. Okay. Is it your sworn testimony today that you had fee agreements in every single one of those cases? Yes. And as I said in my response, for most of these individuals, I helped them out from the very start. And we wrote up agreements to represent them in immigration court for a flat rate fee. They typically would pay maybe 30 percent, sometimes 50 percent of that fee up front and make – and, you know, these people don't have a lot of money, so I made arrangements with them to pay $100 a month or $200 a month until they paid off their balance. The course of the proceedings took less time than their fee agreement to pay my office. Instead of writing up a different fee agreement to, you know, handle their appeals, whatever necessary appeals was possible, I agreed to let them just pay off their amount that they owed my office under the, you know, the fee agreement that we already created and not require more money from them. Was this something that they knew about when they signed the agreement or just something that you explained to them at the time that they had the appeal? It was something I explained to them at the time that they had the appeal. So, but let's say I'm one of your clients and I paid everything off before the appeal, but I lost and I needed to appeal, then would you require an additional amount for the appeal? I would at that point. However, these clients, some of them, they still haven't paid me. I don't know if I'm just a very lenient and reasonable person with them, but some of them only paid the initial retainer fee and maybe for a few months made up with their balances. But I don't believe there's a time when they made their – I think afterwards, after filing the appeals, they paid their balance, but I don't think there was a time to – What's the filing fee at the Board of Immigration Appeals? It's $110. So when – here it comes, you want to file the appeal. Where does the $110 come from? It comes from them. So they would have to pay that no matter what. Right. And then the Board of Appeals denies them relief and then you file a petition for review in the Ninth Circuit. That costs how much? $450. Or $500. How – and where does that money come from? It comes from the client. What if the client doesn't have the money? I – I can only remember one or two occasions when that happened and I paid it up front for them. Were you aware that you could file a motion for relief to proceed in the form of paupers for a client who can't afford to pay? I did, but only after the – only during Ms. Peraza's case. Because we sent you a number of orders to show cause why the case should not be dismissed for failure to pay fees or to file a motion for relief to proceed in the form of paupers with a financial affidavit. Do you recall that? I do recall that. How did you respond? I didn't respond to – we just paid the fees up – we just paid the fees. Okay, you just paid the fees, but you just paid the fees in – I don't know, but it was – it was late. It was after several – Well, let me ask you this, too, because this is puzzling to me. You filed the petition for review in Peraza's case on October 15th. October 19th, we sent you the fee order to show cause why the case should not be dismissed for failure to pay fees or file a relief to proceed in the form of paupers form. And then no response. A month later, we dismissed the case. Then you filed the motion to reopen and you said in your motion to reopen that the petitioner had submitted the payment to you, but we had never received the fees. The fees were never paid. Do you remember why that was? I don't remember, Your Honor. This happened twice. That was on January 28th, and then three days later we denied your motion to reopen without prejudice renewal with the payment of fees or in the form of paupers submission. Then a month and a half later, you filed another motion to reopen and again said petitioner submitted payment, but still you had not paid fees. You don't know why that would be? I don't, Your Honor. I just remember – Does that sound familiar to you, that that was the case? Had you lost the money or applied it somewhere else? I remember specifically for this case I paid it myself. I don't remember when. Okay. You did it, it was either, it was somewhere late, I think late April or early May. Anyway, this was six months or so and more than six months after the petition for review was filed. Now, three of the cases – let's move on to some of the other cases. We may come back to parousal later, but three of the cases that were dismissed for failure to prosecute were dismissed on jurisdictional grounds, that is, not for failure to pay fees, not for failure to prosecute, not for failure to file a brief, but because the Court of Appeals lacked jurisdiction. And these cases were Escobita-Cardona, Aparicio-Pascual, and Venegas-Claro. Now, these were cancellation decisions, denial of cancellation of removal. Were you aware that there would be a jurisdictional problem in the Ninth Circuit obtaining review of those decisions? I was not aware at that time, Your Honor. So in those three cases the Court issued an order to show cause why this Court has jurisdiction to review the case, why the case shouldn't be dismissed, because we don't have jurisdiction to review denial of cancellation by the BIA. And you didn't respond to any of those orders to show cause. Why didn't you respond? I don't have an answer for that, Your Honor. For some of these crimes, I don't remember which one. Okay. So, I mean, I could ask a lot more questions about this, but I'm not sure it's going to be profitable to do so. I think I understand your position, which, what I'm hearing you saying, is you really didn't feel and don't feel competent to practice in the Ninth Circuit at this stage in your career. Is that a reasonable determination? At this point in my career, no. There's a lot I need to learn. So here's what the options are at this stage for me. I can issue an order deciding all this and suspending you for a lengthy period of time, which I would imagine would be something on the order of two to three years, require you to take a number of continuing education classes as a prerequisite to you seeking to regain admittance to the Ninth Circuit. That's one option. The second option is you can voluntarily resign from the bar of the Ninth Circuit with charges pending, in which case I will not issue an order to show cause. I mean I will not issue a report and recommendation sending out everything. In either case, however, our order will be filed on the California State Bar and on the Executive Office for Immigration Review, both of which have independent attorney disciplinary processes and they will do whatever they choose to do with respect to your continued practice there. I don't see any other option at this stage. It's just not in anybody's interest for you to continue practicing at the Ninth Circuit. There's no benefit to the clients when you are as unskilled as you are in appellate practice. So having heard that, do you have any reaction? Your Honor, can I just have you explain again the option where I would voluntarily resign? Well, you can submit a written resignation from the bar of the Ninth Circuit. What I'm going to do in any event after this hearing is over is I have to prepare a report and recommendation to a panel of three judges. I can recommend after setting out all the findings that I would make that you be suspended and my sense is that my recommended suspension would be for at least two years with a requirement of continuing education before you could be readmitted to practice in the court followed by a period of probation if you were to be admitted to practice in the court. So that's option number one. That would go to a panel of judges that would rule on it. The second option is you could submit your resignation to the bar of the Ninth Circuit. I would take that resignation request and recommend that the court accept your resignation from the bar of the Ninth Circuit with charges pending and that that determination also would be served on the California State Bar and the EIOR disciplinary unit as would any suspension order that the court might approve. So I don't insist upon you making a decision right this second, but I don't see any other options. If I may ask, what does it mean with the charges pending? That means you had an order to show cause that was in the process of being determined. So if they choose to do so, they would have access to the order to show cause to see what the allegations were. I don't really know how they handle it. It might be that they would look at it as if it were a nolo contendere. Do you know what that is, nolo contendere? I'm not going to contest the charge. I'm going to resign from the Ninth Circuit. Or I can do a reporting recommendation recommending a suspension, which I think would likely be upheld. And then so you would be suspended from the Ninth Circuit as opposed to having you resigning from the Ninth Circuit. How these other entities would look at it, I don't know. So when you refer to charges pending, that's for the other entities to have the ability to... So they'll understand that it wasn't just Christopher McGreg decided he doesn't want to practice in the Ninth Circuit anymore and decided to pull out. He was forced out in a sense. He withdrew rather than having to contest the charges. I understand. Now if you want an amount of time to think about this and respond, I'm willing to give that to you. If you would prefer to make a decision now and live with it, I'm also willing to accept that. How much time can I have to think about it? How about Monday, next Monday? And what would I have to do by next Monday? You would have to either... Well, by the end of the day Monday you would have to submit a resignation or I will simply deem that as being your determination that we issue a report and recommendation. You can use the time between now and then to do whatever investigation you deem appropriate as to the collateral effects of those two types of determinations. Okay. If I do voluntarily resign, I don't imagine that I would ever apply for readmittance, but is that a possibility in the future? If you were to voluntarily resign, you would have to reapply with a showing that you're fit to practice in the Ninth Circuit. And given the fact that you resigned with charges pending, we would require you to make a showing that you had, for example, taken a significant amount of continuing legal education classes in appellate practice and in immigration practice and the interchange of those two. But, you know, I think from what you've told me and my observation of this, I go back to what I said earlier about some lawyers are cut out to be trial lawyers and some lawyers are cut out to be appellate lawyers. And I think you fall into the trial lawyer category, not the appellate lawyer category. I mean, if this is any indication, it's just like it does not show the kind of attention to detail, thoughtfulness, strategic thinking that appellate lawyers use. I mean, your practice as you describe it is a high volume, quick, on-your-feet practice where you get things done and then move on to the next thing, move on to the next thing. You check your iPhone to find out what the mail is, and then you move and you keep moving. That's not the way an appellate lawyer works. An appellate lawyer sits and thinks a lot and writes and drafts and redrafts and edits and strategizes and reads a lot of cases and stuff. That doesn't sound to me like that's you based upon what I see in the work in front of me. I understand that. I agree with that, yes. Okay. All right, so on Monday. So you can communicate with my law clerk about this, or you can file just on the docket in this disciplinary matter, this 14-80112, you can file an official resignation letter. Okay. And then I will recommend that the court accept your resignation with charges pending. Okay. Well, I think that would be easier if I just do that. I'm going to give you until Monday to make that call. Okay. I'm going to look for a written letter from you to do that, okay? Is there anything specifically I should indicate in the letter? No, no. Just in this letter, in light of the charges against me or in light of my determination, I conclude that it would be in my best interest to resign from the bar of the Ninth Circuit. Okay. Please accept my resignation. Okay. It would be sufficient. But I do want you to spend some time for your own well-being and peace of mind to try and figure out whether there's any difference in terms of how you'll be treated by the California Bar and by EIOR in terms of your ability to continue practicing at the Immigration Court and the BIA, because they may have some consequences there. All right. I'll have to find out what those consequences are. All right. There is one matter that we do need to address before we complete this, and that is the status of your one pending case in the court. Mr. Vasquez? Yes, exactly. So this brief is now overdue, and I believe that there's an indication somewhere in the record that you intended to seek mediation, I assume for the exercise of prosecutorial discretion, but I don't think anything has been done. As far as I know, this is in sort of a state of limbo. What is your explanation? I have been actually working on filing this. I was intending to file this before this hearing, but some things came up with my family, so I needed to. We are going to, well, the plan was to file the request to refer to mediation, just like Ms. Peraza's case, but I don't know how this is going to affect now if I turn in the resignation on Monday. Well, it's possible for your resignation to be effective after the conclusion of that case, or you can locate appellate counsel, which is what I think should have occurred all along, to represent your client. Okay, well, I'm going to need to talk to him about that. If I do, if he still wants me to help him with at least asking for this case to be referred to mediation, how do I, do I just address that in my letter on Monday, the resignation? You can address that, but I really think you need to get that case to another lawyer. Okay. So, I'm reminded that our typical order of resignation, when we accept it, requires an attorney to withdraw from all cases within 14 days. I see. So, you can do a lot within 14 days, so the resignation would not necessarily preclude you from at least getting a letter in and getting another lawyer to go forward with the mediation in the event that that's accepted into the mediation program. Okay. Do you have anything else you want to say? Just, you know, I'm going to think about what I need to do here and how it affects my future. I do just want to extend my apologies to the Court. This is not how I, this is my first time in the appellate court, and this is not how I envisioned it being, so I just want to extend my apologies. I do treat all my clients with, you know, 100% gusto, and so I do just want to let the Court know that I do apologize for, you know, what would appear that I take light of a lot of the rules and regulations of this Court. Yeah. Well, I wish it were apparent to the Court that you did that, but as you can see from the Court's perspective, it's hard to see any gusto. And I think that step number one for you is to be very careful about your relationship with all the courts that you appear in because you're an officer of the Court, and you have an obligation to conduct yourself that way and make sure that you're assisting the Court in its important duty of administering justice, which it has to rely on lawyers to do that. I understand. We need you. All right. So this, we will withhold submission of this matter until Monday, and you can respond on Monday. If we don't hear from you by the end of the day Monday, on Tuesday we'll be preparing our report and recommendation concerning the suspension. If we hear from you by Monday with a request for resignation, I will recommend that it be accepted. All right?  Thank you. Thank you.
judges: Appellate Commissioner Shaw